## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CSX TRANSPORTATION, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CASE NO.   11-CV-171-WDS** |
| ) | |
| **TOTAL GRAIN MARKETING, LLC,** ) | |
| **Defendant.** ) | |
| ) | |

## <u>MEMORANDUM & ORDER</u>

**STIEHL, District Judge:**

Before the Court is plaintiff's motion for partial summary judgment (Doc. 64), to which defendant has filed a response (Doc. 82), and plaintiff a reply (Doc. 84).   Also before the Court is plaintiff's motion for partial summary judgment based on federal preemption (Doc. 90), to which defendant has filed a response (Doc. 100), and plaintiff a reply (Doc. 101).   Defendant has also filed a motion for summary judgment (Doc. 92), to which plaintiff has filed a response (Doc. 103), and defendant a reply (Doc. 105).

This series of motions is less than a model of clarity.   These motions in essence, ask the Court to decide who, based on contractual agreements between the parties, bears responsibility for and, therefore, the costs of a 2009 train derailment.   The contractual agreements involved in the parties' ultimate agreement are many.   In 2006 TGM was the recipient of an "Assignment" of rights from a non-party, Huisinga Grain, Inc. ("Huisinga"), of Huisinga's rights under agreements (from 1972 and 1983) with CSX (or its predecessor in interest).   TGM then executed a 2006 "Assumption" of those rights, subject to certain amendments listed in the 2006 Assumption.   In 2007 CSX signed a "Consent" agreeing to the terms of the Assignment and Assumption.   All of these agreements, including the 1972 and 1983 Agreements, republished according to the terms of

the 2006 Assumption, created one clumsy final agreement between TGM and CSX.

## BACKGROUND

Plaintiff, CSX Transportation, Inc. ("CSX"), brought this action to recover approximately $77,000 in property damage that was allegedly caused by a train derailment.   Defendant, Total Grain Marketing, LLC ("TGM"), has filed a five-count counterclaim seeking to recover approximately $40,000 in property damage allegedly caused by the same derailment.

### I.      The Derailment

On July 3, 2009, a CSX crew, consisting of an engineer and a conductor, was retrieving a train of sixty-six (66) rail cars that TGM had placed on the industry track the previous evening after loading them with grain from their grain elevator located adjacent to the track in Casey, Illinois.   When the CSX crew attempted to pull the train toward the main line, 6 railcars derailed as they passed over a switch that was allegedly not properly aligned, and, had been "run through," thereby damaging the switch so that railcars passing over the switch would move in an unintended direction.   According to TGM, a "run through" in these circumstances means that the switch was lined for cars west of the switch to go southeast onto the industry track from the sidetrack; however, cars on the east side of the switch on the sidetrack were instead pushed backwards through the switch in a westerly direction (also called a "trailing point move") causing damage to the switch.   When the CSX engineer pulled the railcars eastward, the cars derailed due to the damage caused to the switch by the prior run-through.

The switch was located in a turnout where the western side of the industry track (also referred to by the parties as the "loading track," and "Track No. 80") split south from the sidetrack (also referred to by the parties as the "leased track" and "Track No. 9").   In its motion for summary judgment, TGM provided the following diagram of the tracks and switch where the

2

derailment occurred.   There is no indication of the scale of the drawing or particular

measurements, but a visual depiction of the tracks and switch at issue is a helpful aide in

understanding the issues of this case.   CSX has not objected to this depiction of the site.   The

Court will refer to the particular tracks as indicated below as the "industry track," the "sidetrack,"

and the "main line."



On July 2, 2009 (the day before the derailment), TGM personnel had operated that switch

while loading the railcars with grain.   During the loading process, the railcars would have passed

over or through that switch approximately eight times.   The railcars were left parked on top of the

switch overnight.   From the close of business on July 2, 2009, until sometime after the derailment

on July 3, 2009, TGM personnel did not control or exercise control over the switch at which the

derailment occurred.

On July 3, 2009, prior to moving the train, the CSX conductor manipulated a different

switch, which allowed the train to move onto the main line.   The conductor did not inspect the

switch located under the train, although TGM alleges he was required to do so pursuant to CSX's

Operating Rules.   The locomotive pulling the train was several hundred feet to the east of the

switch, and the rear of the train was several hundred feet to the west of the switch.   The CSX crew

backed the train over the switch at issue 112 feet, in an alleged trailing point move, before moving

forward, at which time, the railcars derailed.   The CSX engineer who operated the train during the derailment failed to shut off the engines upon first feeling resistance in the pull of the train, although TGM alleges he was required to do so pursuant to CSX's Operating Rules.   The CSX engineer allowed the train to come to a stop on its own as a result of the further derailment of the cars.   The CSX engineer then accelerated the engines, even though he had received confirmation from the conductor that the air brakes were not the issue, moving the train farther forward until the engines were allegedly hopping up and down and could go no further.

The train was equipped with an on-board event data recorder.[1]   CSX initially asserted that the data was not downloaded from the event recorder in this instance, and no longer retrievable. CSX has subsequently asserted, however, that it has located the data from the event recorder and produced it to TGM during discovery.   (Doc. 91).

Data recorded by the electronic monitoring device aboard the train, and disclosed by CSX, confirmed that the CSX engineer allowed the train to travel over 100 feet after feeling resistance, and before applying the brakes or shutting down the engines, and accelerated the train after it came to a stop.   CSX disputes the allegation that the engineer's acceleration of the train caused the engines to hop up and down.   The data recorder also confirmed that the CSX crew backed the train over the switch 112 feet before proceeding forward and derailing the 6 railcars.

TGM claims that video footage from a video recorder on the locomotive may have been recorded on the date of the derailment, but that CSX did not preserve the footage, and TGM raises a spoliation claim on this basis.   TGM asserts that the video footage would show that the engineer's actions in fact caused the engines to hop up and down, and that the engineer caused the train to further move forward a short distance after the train had come to a stop on its own, despite

---

[1]  The event data recorder records various types of information regarding the operation of the train, including date, time, speed, fuel consumption, operation of on board warning signals (bells and horns), air pressure, and braking.

previously confirming with the conductor that the air brakes were not the cause of the stoppage. TGM claims that CSX failed to preserve the video recording, although it was required to retain the video recordings until at least December of 2012, in accordance with its general retention policies with respect to investigative material and information from the derailment.   TGM claims that it has been unable to fully develop this claim however, and obtain information regarding CSX's retention policy with respect to these video recordings specifically, because CSX has failed to designate a witness or provide information in accordance with TGM's supplemental Rule 30(b)(6) Deposition Notice and the Court's corresponding order, with respect to video recording devices about the locomotive and preservation of video taken by the devices.

CSX employees who investigated the derailment and coordinated the re-railing of the derailed cars concluded that the cause of the derailment was that the switch had been "run through" by TGM.   TGM asserts, however, that CSX has not produced and cannot produce sufficient evidence creating a genuine issue of material fact that anyone from TGM ran through the switch on July 2, 2009.   TGM asserts that vandals could have moved the switches to the wrong position, a proposition that has not been ruled out.   Additionally, TGM asserts that because the CSX crew backed the train up 112 feet prior to forward movement, pushing cars through the switch at issue, it could have been CSX that ran through the switch at issue and caused the damage which caused the derailment.

## II.    Agreements

TGM began operations at the Casey, Illinois location pursuant to a September 2006 Assignment and Assumption between TGM and Huisinga.   Huisinga was the previous grain elevator operator.   CSX agreed to and consented to the assignment and assumption, by executing a "Consent" in 2007, and, in fact, prepared and drafted both the 2006 Assignment and Assumption

5

executed by TGM and Huisinga.

Pursuant to the 2006 Assignment, Huisinga Grain assigned its rights and interests to TGM in the three agreements identified in Schedule A of the Assignment.   Pursuant to the 2006 Assumption Agreement, ("2006 Assumption"), TGM agreed to assume the agreements assigned by Huisigna, subject to certain specific additional terms and conditions. The three agreements included: (1) a 1972 Sidetrack Agreement (the "'72 Agreement") originally executed by Huisinga and Penn Central Transportation Company (CSX is a successor to Penn Central); (2) a 1983 Lease Agreement (the "'83 Agreement") originally executed by Huisinga and Consolidated Rail Corporation (CSX is a successor to Consolidated Rail Corporation); and (3) a 2001 Agreement originally executed by Huisinga and CSX.   Under the terms of the 2006 Assumption, TGM was bound by the terms of the three agreements as if an original party thereto, and bound by certain amendments specifically referenced.

The 2006 Assumption also contained the following clause: "[a]ll other terms contained in the Agreement(s) shall remain as if republished herein."   (Doc. 64-6 at 6).   The 2006 Assumption, therefore, republished the terms of both the '72 Agreement and the '83 Agreement, including the agreements' terms regarding liability and indemnification, which are conflicting. Specifically, the '72 Agreement provides:

> Except as herein otherwise specifically provided, in respect of all loss or damage to property, other than by fire as aforesaid, or in respect of injury to or death of persons, caused by or in connection with the construction, operation, maintenance, use, presence or removal of said sidetrack, as between the parties hereto;
>
> (i) The Railroad shall assume responsibility for and hold the Industry harmless and defend the Industry from all losses (including claims for injuries to employes [sic] of the Industry or of the Railroad), expenses, attorneys' fees, damages, claims and judgments arising from or growing out of the actionable acts or omissions of the Railroad, its agents or employes [sic], solely or in conjunction with a third person;
>
> (ii)   The Industry shall assume responsibility for and hold Railroad harmless and defend the Railroad from all losses (including claims for injuries to employes [sic]

of the Industry or of the Railroad), expenses, attorneys' fees, damages, claims and judgments arising from or growing out of the actionable acts or omissions of the Industry, its agents or employes [sic], solely or in conjunction with a third person; and

(iii)   The parties hereto shall equally bear all losses (including claims for injuries to employes [sic] of the Industry or of the Railroad), expenses, attorneys' fees, damages, claims and judgments arising from or growing out of the joint or concurring actionable acts or omissions of both parties hereto, their respective agents or employes [sic].

(Doc. 64-3 at 4).

The '83 Agreement provides:

Lessee will be responsible for and will indemnify, save harmless and defend the Railroad Company against and from any and all claims and suits for, and any and all liability, loss or expense arising from or incidental to or in connection with, damage to or loss of property of the Railroad Company, Lessee, or of agents, servants or employees of either, or of any other person, and against and from any and all claims and suits for, and any and all liability, loss or expense arising from or incidental to or in connection with, injury to or death of persons, including agents, servants, or employees of the Railroad Company, or of Lessee, or any other person (including Lessee if a natural person), which said damage, loss, injury or death shall arise in any manner, directly or indirectly, out of or incidental to or in connection with, this lease or the demised premises, of the use or occupation thereof.

(Doc. 64-5 at 2).

### III.   Claims and Counterclaims

CSX's Amended Complaint contains three separate causes of action: (1) breach of contract for violation of the '83 Agreement; (2) negligence (in the alternative) alleging that TGM is vicariously liable for the actions and/or inactions of its employees with respect to the derailment, and that TGM's negligence was the proximate cause of the costs incurred by CSX; and (3) res ipsa loquitur (in the alternative), alleging that TGM operated and maintained the switch at issue immediately before the derailment, and that a derailment would not typically occur in the absence of negligence, and therefore, the inference may be drawn that TGM was negligent.   For each

count, CSX requests judgment in its favor and against TGM, and seeks no less than $120,262.23, together with costs, prejudgment interest, additional attorneys' fees, and such other relief as the Court may allow.

TGM alleges five counterclaims: (1) a negligence claim for failure to maintain and/or inspect the track and switch at issue; and/or failure to properly operate the engines pulling the train; (2) CSX's engineer's conduct constitutes willful and wanton and/or intentional conduct; (3) indemnification; (4) negligent spoliation of evidence for negligently failing to preserve data from the electronic monitoring device and allowing destruction of the same; and (5) willful and wanton spoliation of evidence.

### IV.    Motions for Summary Judgment

CSX's first motion for partial summary judgment (Doc. 64) seeks judgment with respect to Count I of its Amended Complaint based on CSX's assertion that the '83 Agreement entitles it to total indemnification for the derailment at issue, regardless of whether CSX's negligence caused or contributed to the damage.   CSX also seeks summary judgment with respect to Counts I, III, IV (in part) and V of TGM's Counterclaim, based on the same assertion that the '83 indemnification clause bars Counts I, III, and IV (in part) of TGM's counterclaims.   CSX also asserts that it is entitled to attorney's fees pursuant to the '83 Agreement.   CSX seeks summary judgment on Count V of TGM's Counterclaim, based on its assertion that there is no recognized cause of action in Illinois for willful and wanton spoliation of evidence.

CSX's second motion for partial summary judgment (Doc. 90) seeks judgment in its favor with respect to Counts I, IV and V of TGM's counterclaims on the basis of federal preemption.

TGM also filed a motion for summary judgment, seeking judgment in its favor on Counts I, II, and III of CSX's amended complaint.   TGM seeks summary judgment on Count I on the basis

that the '83 Agreement's exculpatory clause is unenforceable in that it is void, and unconscionable, and that application of the clause in this instance would be contrary to the rules of contract interpretation.   TGM seeks summary judgment on Count II because CSX failed to produce sufficient evidence that establishes causation, an essential element of Count II.   TGM seeks summary judgment on Count III because TGM was not in exclusive control of the switch that allegedly caused the derailment.

## LEGAL STANDARD

Summary judgment is proper when the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).   The Court must draw all reasonable inferences and resolve all factual disputes in favor of the non-movant.   *Malen v. MTD Products, Inc.*, 628 F.3d 296, 303 (7th Cir. 2010).   A court can not grant summary judgment if a genuine dispute relates to a material fact, meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The non-movant must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   If the non-movant fails to establish an essential element, there is a complete failure of proof and the moving party is entitled to judgment as a matter of law.   *Id*. at 323.   Furthermore, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts."   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   The Court will "not draw inferences 'that are

9

supported by only speculation or conjecture.'"  *Collins v. American Red Cross*, No. 11-3345, 2013 WL 856512, at *1 (7th Cir. March 8, 2013) (quoting *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)).

## ANALYSIS

### I.   INDEMNIFICATION

CSX's first motion for partial summary judgment (Doc. 64) seeks judgment with respect to Count I of its Amended Complaint, and with respect to Counts I, III, and IV (in part) of TGM's counterclaims, based on CSX's assertion that the '83 Agreement entitles it to total indemnification for the derailment at issue, regardless of whether CSX's negligence caused or contributed to the damage.   CSX asserts that the '83 indemnification clause bars Counts I, III, and IV (in part) of TGM's counterclaims.   CSX also asserts that it is entitled to attorney's fees pursuant to the '83 Agreement.

TGM asserts that in 1983, when the '83 Agreement was executed, indemnification clauses exempting lessors from liability for their own negligence were deemed void as against public policy and wholly unenforceable in Illinois.   TGM claims that the indemnification clause in the '83 Agreement is, therefore, void and unenforceable as a matter of law because the law at the time the contract was executed governs its interpretation, application, and effect.   Further, TGM asserts that pursuant to Illinois law, the assignee steps into the shoes of the assignor and assumes the same rights, title and interest possessed by the assignor, and that the assignee takes the assignor's interest subject to all legal and equitable defenses existing at the time of the assignment. Based upon its foregoing analysis, TGM asserts that the indemnification clause was void in 1983, and when TGM stepped into the shoes of Huisinga in 2006, the clause remained void.

In other words, TGM asserts that CSX should be denied summary judgment as to Count I

of its amended complaint because the indemnification clause in the '83 Agreement is void and

unenforceable as a matter of law, and was not assumed by TGM or a right acquired by CSX when

CSX acquired Conrail; that it would be unconscionable to enforce the '83 indemnification clause

under the circumstances of this case because TGM had not seen the '83 Agreement when it

executed the 2006 Assumption; that there is a genuine issue of material fact as to the willful and

wanton nature of the CSX conductor's and engineer's conduct in this case, which would render the

'83 indemnification provision unenforceable; and that the rules of contractual interpretation render

the '83 indemnification clause unenforceable.   TGM requests that the Court declare that the '83

indemnification clause is void and unenforceable and that the '72 Agreement governs liability in

this suit.   TGM asserts essentially the same arguments in its motion for summary judgment as to

Count I of CSX's Amended Complaint.

"The construction of a contract presents a question of law."   *Gallagher v. Lenart*, 874

N.E.2d 43, 50 (Ill. 2007).   Pursuant to Illinois law:

> [t]he primary objective in construing a contract is to give effect to the intent of the
> parties.   A court must initially look to the language of a contract alone, as the
> language, given its plain and ordinary meaning, is the best indication of the parties'
> intent.   Moreover, because words derive their meaning from the context in which
> they are used, a contract must be construed as a whole, viewing each part in light of
> the others.   The intent of the parties is not to be gathered from detached portions of
> a contract or from any clause or provision standing by itself.   If the language of the
> contract is susceptible to more than one meaning, it is ambiguous.   In that case, a
> court may consider extrinsic evidence to ascertain the parties' intent.

*Id.* at 58-59 (citations omitted).   "A contract, . . . ., is to be construed as a whole, giving meaning

and effect to every provision thereof, if possible, since it will be presumed that everything in the

contract was inserted deliberately and for a purpose."   *Martindell v. Lake Shore Nat. Bank*, 154

N.E.2d 683, 689 (Ill. 1958).

"Where a contract incorporates another document by reference, its terms become part of

the contract." *Lease Management Equipment Corp. v. DFO Partnership*, 910 N.E.2d 709, 715 (Ill.App.Ct. 2009). "In determining whether an ambiguity exists, the court applies the 'four corners rule' and looks to the language of the agreement alone." *Id.*

If the Court determines that the contract language is ambiguous, "extrinsic evidence is admissible to determine the parties' intent and the interpretation of the language is a question of fact." *Bradley Real Estate Trust v. Dolan Associates Ltd.*, 640 N.E.2d 9, 11-12 (Ill.App.Ct. 1994). "Illinois decisional law clearly indicates that the trial court must find a contract ambiguous, as a matter of law, before extrinsic and parol evidence is introduced at trial for consideration by the trier of fact." *Sunstream Jet Exp., Inc. v. International Air Service Co., Ltd.*, 734 F.2d 1258, 1267 (7th Cir. 1984).

In Illinois, a contract is ambiguous if the language "is reasonably and fairly susceptible to more than one meaning." *Lenzi v. Morkin*, 452 N.E.2d 667, 669 (Ill.App.Ct. 1983). "[U]nder Illinois law, 'if the extrinsic facts and circumstances are controverted or if the meaning of the contract is uncertain in light of the extrinsic evidence, then the intent of the parties to the contract must be determined as a question of fact by the jury . . . .'" *Sunstream*, 734 F.2d at 1270 (quoting *Nerone v. Boehler*, 340 N.E.2d 534, 537 (Ill.App.Ct. 1976)).

Both parties' arguments are based upon a contract which is anything but clear with respect to their agreement. The 2006 Assumption contains a clause stating that "[a]ll other terms contained in the Agreement(s) shall remain as if republished herein," and specifically includes the '72 and '83 Agreements. (Doc. 64-6 at 6). The republication of both the '72 and '83 Agreements within the 2006 Assumption resulted in a contract with conflicting clauses regarding liability and indemnity; in other words, an ambiguous contract. Upon careful consideration of the '72 and '83 Agreements, the Court has determined that they both apply to the track and switch at

issue.   The Court **FINDS** therefore, that the parties' final agreement, made up of the 2006 Assignment, 2006 Assumption (which republishes the '72 and '83 Agreements), and 2007 Consent, is ambiguous as a matter of law.

Due to the fact that the Court has determined that the 2006 Assumption is ambiguous, intent of the parties, a topic thoroughly contested by both parties, is a question of fact for the jury, and summary judgment is inappropriate.   To briefly summarize, the parties have made the following assertions with respect to their intent upon execution of the 2006 Assumption and the subsequent consent: TGM executed the 2006 Assumption without ever having seen the '83 Agreement, and can therefore not have intended to be bound by its exculpatory clause; after the derailment, CSX acted as if the '72 Agreement applied to the incident, and apparently believed this was accurate at the inception of this lawsuit and up to the eve of the settlement conference, when it first presented the '83 Agreement as applicable; there is no evidence that prior to the eve of the settlement conference, either side ever knew that the '83 indemnification provision provided for total indemnification, or that this provision conflicted with the provisions included in the '72 Agreement; CSX claims that TGM performed maintenance and made lease payments in accordance with the '83 Agreement, although TGM claims it did so in accordance with the 2006 Assumption; the '72 Agreement was not expressly cancelled until 2010.   In sum, based on the parties' assertions, the intent of the parties and meaning of the contract is strongly contested by both sides, and must be left for the jury to decide.

TGM argues that the '83 Indemnification is void as a matter of public policy, thereby removing any ambiguity and only leaving the '72 Agreement's indemnification provision.   In the state of Illinois:

> agreements to indemnify against intentional misconduct generally are void as against public policy and unenforceable. *Davis v. Commonwealth Edison Co.*, 61 Ill.2d 494, 336 N.E.2d 881, 885 (1975). There are at least two exceptions: (1)

> Illinois law permits insurance agreements against intentional misconduct when the beneficiary of the proceeds is not the wrongdoer, *see Dixon Distributing Co. v. Hanover Insurance Co.*, 161 Ill.2d 433, 204 Ill.Dec. 171, 641 N.E.2d 395, 401 (1994); and (2) Illinois law permits agreements to be construed as indemnifying a person against his own negligence (and perhaps intentional misconduct) when supported by clear and explicit language, *see Westinghouse Electric Elevator Co. v. La Salle Monroe Building Corp.*, 395 Ill. 429, 70 N.E.2d 604, 607 (1946).

*Brennan v. Connors*, 644 F.3d 559, 562 (7th Cir. 2011).   "For many years the Illinois Supreme Court has followed the rule that 'an indemnity contract will not be construed as indemnifying one against his own negligence, unless such a construction is required by clear and explicit language of the contract, or such intention is expressed in unequivocal terms.'"   *Chicago Housing Authority v. Federal Sec., Inc.*, 161 F.3d 485, 487 (7th Cir. 1998) (quoting *Westinghouse Elec. Elevator Co. v. LaSalle Monroe Bldg. Corp.*, 70 N.E.2d 604, 607 (Ill. 1946)).   The Court must first "decide whether the contract's clear and explicit language required indemnification, or if on the other hand it was ambiguous."   *Chicago Housing Authority*, 161 F.3d at 487.   If there is no ambiguity, the Court must enforce the indemnification clause.   *Id.*

"In an indemnity agreement, a general reference to 'any and all' claims, losses, injuries, and the like, will generally be construed as indicating an intention by the parties that the indemnitee be indemnified for damages resulting from the indemnitee's own negligence."   *Economy Mechanical Industries, Inc. v. T.J. Higgins Co.*, 689 N.E.2d 199, 202-03 (Ill.App.Ct. 1997).   Further, "[t]he Illinois Supreme Court has held that 'an agreement to indemnify against wilful misconduct would, as a general rule, be contrary to public policy and unenforceable though there were no statutes to that effect.'"   *Chicago Housing Authority*, 161 F.3d at 488 (quoting *Davis v. Commonwealth Edison Co.*, 336 N.E.2d 881, 885 (Ill.1975)).   In applying this general rule, the Seventh Circuit has compared the factual context of the Illinois Supreme Court holding with the particular circumstances before it, noting that the indemnification for wilful misconduct

14

was against public policy when the interest at stake was the safety and protection of construction workers. *Id.* "[T]here is no bright-line rule prohibiting indemnification for intentional acts," however, because "public policy also favors affording compensation to victims." *Beavers v. Walsh*, No. 06-2121, 2007 WL 2681098, at *5 (C.D. Ill. August 27, 2007). The agreement need not contain a specific reference to indemnification against liability arising out of the indemnitee's negligence, instead, all of the contract's language and provisions should be considered and given a fair and reasonable interpretation. *Chicago Housing Authority*, 161 F.3d at 487.

Here, the indemnification clause contained in the '83 Agreement sufficiently covers indemnification of CSX, even for acts of negligence. TGM's argument that indemnification clauses are void as against public policy if they indemnify a party for willful and wanton conduct, is not determinative at this point. A genuine issue of material fact remains as to whether the CSX engineer's and conductor's conduct was merely negligent, or amounted to willful and wanton conduct, making summary judgment, on this basis, inappropriate.

TGM also argues that the indemnification clause in the '83 Agreement was void at the time of its execution in 1983, and remains void, and is therefore not a right held by CSX or a duty assumed by TGM in the 2006 Assumption. "Elementary contract law provides that upon a valid and unqualified assignment, the assignee stands in the shoes of the assignor and assumes the same rights, title and interest possessed by the assignor." *Moutsopoulos v. American Mut. Ins. Co. of Boston*, 607 F.2d 1185, 1189 (7th Cir. 1979). Furthermore, the assignee "takes the assignor's interest subject to all legal and equitable defenses existing at the time of assignment." *Stavros v. Karkomi*, 349 N.E.2d 599, 607 (Ill.App.Ct. 1976). "Illinois law requires that a contract be interpreted in light of the law that exists at the time of its execution." *South Bend Lathe, Inc. v. Amsted Industries, Inc.*, 925 F.2d 1043, 1046 (7th Cir. 1991).

15

Even if the indemnification clause was void at the time it was executed in 1983, TGM executed the Assumption in 2006, and the terms were "republished" therein.   CSX asserts that the '83 Indemnification clause is enforceable, and that the Illinois legislature amended the statute on which TGM relies, rendering the public policy exception inapplicable to non-residential leases that exempt lessors from liability for property damage claims.   CSX further argues that the law as it stood in 2006 should apply, as that is the date the agreement was executed by TGM.   CSX argues, and this Court agrees, that the law of 2006 is applicable to the indemnification clause, saving the clause from being rendered void and unenforceable pursuant to the law as it stood in Illinois in 1983.

Finally, TGM's assertion that the indemnification clause contained in the '83 Agreement should be found unenforceable on the basis that TGM had not seen the '83 Agreement is without merit.   A party is bound by an explicit incorporation of another document by the party's signature clearly consenting to the document, even if the party has not seen the incorporated document. *Norman Sec. Systems, Inc. v. Monitor Dynamics, Inc.*, 740 F.Supp. 1364, 1368, n.3 (N.D. Ill. 1990).

Accordingly, CSX's motion for summary judgment on Count I of CSX's amended complaint, and Counts II, III, and IV (in part), based on the indemnification clause contained in the '83 Agreement, is **DENIED**.   Likewise, TGM's motion for summary judgment as to Count I of CSX's amended complaint is **DENIED**.

## II.     NEGLIGENT SPOLIATION OF EVIDENCE

CSX asserts that spoliation of evidence is not an independent cause of action in Illinois. CSX also asserts that even if CSX had a duty to preserve data, the '83 indemnification clause bars TGM from pursuing negligence claims against CSX, and therefore, even if TGM had the data,

16

TGM does not have a reasonable probability of success on its negligence claims in light of the '83 indemnification clause.   In accordance with the ruling above, summary judgment can not be granted on the basis that the '83 Agreement bars TGM from pursuing a negligence claim against CSX.

"An action for negligent spoliation of evidence can be stated under existing negligence law without creating a new tort.   To state a cause of action for negligence, a plaintiff must plead the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, an injury proximately caused by the breach, and damages."   *Boyd v. Travelers Ins. Co.*, 652 N.E.2d 267, 270 (Ill. 1995) (internal citations omitted).   TGM has alleged its negligent spoliation counterclaim as a form of negligence, and, therefore, CSX's motion for summary judgment as to Count IV of TGM's Counterclaims is **DENIED**.

### III.   WILLFUL AND WANTON SPOLIATION OF EVIDENCE

CSX asserts that Illinois courts do not recognize a cause of action for willful and wanton or intentional spoliation of evidence, and the Court should, therefore, grant summary judgment in CSX's favor with respect to Count V of TGM's counterclaim.   TGM asserts that Count V is not an assertion of a new or independent tort, but an assertion pled pursuant to general negligence principles, and that CSX's conduct during the spoliation amounted to willful and wanton conduct.

In *Boyd*, the "watershed" case in Illinois with respect to spoliation claims, the court did not reach the issue of whether a tort for intentional spoliation of evidence is viable because the allegations did not support a claim for intentional spoliation.   *Orr v. Knapheide Mfg. Co.*, No. 10-CV-1123, 2010 WL 4923315, at *2 (C.D. Ill. October 26, 2010) (citing *Boyd*, 652 N.E.2d at 273).   The Illinois Supreme Court has made no further pronouncements regarding tort actions for intentional spoliation, and this Court, sitting in diversity, "must determine the issues presented

17

herein as we believe the [Illinois] courts would under the circumstances." *Orr*, 2010 WL 4923315, at *3 (internal quotation omitted).

The *Orr* Court conducted an exhaustive review of the federal and state caselaw on this particular subject, noting that no Illinois Appellate Court has expressly recognized a tort for intentional spoliation, that the Seventh Circuit has analyzed claims for intentional and negligent spoliation as ordinary negligence claims, that the Northern District of Illinois has concluded that the Illinois Supreme Court would recognize an intentional spoliation tort in an appropriate factual scenario; and some other district courts within the circuit have dismissed the intentional spoliation claim, allowing "a negligent spoliation claim to encompass what might arguably fit as an intentional spoliation claim." *Id.* at *4.   Additionally, the Seventh Circuit has noted the lack of allegations or competent evidence of "malicious, willful, or outrageous conduct," as "fatal" to a party's attempt to assert a claim of intentional spoliation of evidence. *Anthony v. Security Pacific Financial Services, Inc.*, 75 F.3d 311, 317 (7th Cir. 1996).   The *Orr* Court concluded that the Illinois courts would not recognize the tort of intentional spoliation of evidence based on the facts alleged in that case, although there may be a factual scenario where such a claim will be recognized. *Orr*, 2010 WL 4923315 at *5.

The Court **FINDS** a similar conclusion is appropriate in this case: while it appears that the Illinois courts may, under the appropriate circumstances, recognize a claim for intentional spoliations of evidence, the facts in this case do not amount to more than what could be encompassed by a negligent spoliation claim.   The Court, therefore, **GRANTS** CSX's motion for summary judgment as to Count V of TGM's counterclaim.

## IV.   FEDERAL PREEMPTION

CSX also seeks summary judgment in its favor on Counts I, IV, and V of TGM's counterclaim

18

on the basis that the claims are preempted by the Federal Railroad Safety Act ("FRSA").   49

U.S.C. §§ 20101 et seq.   The Court's previous conclusion as to Count V of TGM's counterclaim

was dispositive as to that claim, and therefore, the Court will not consider, at this point, whether

TGM's claim of intentional spoliation of evidence is federally preempted. The Court will consider

whether TGM's negligence claim and its negligent spoliation claim are federally preempted.

Federal preemption is treated "as an affirmative defense upon which the defendant bears

the burden of proof." *Russian Media Group, LLC v. Cable America, Inc.*, 598 F.3d 302, 309 (7th

Cir. 2010).   "Affirmative defenses 'must ordinarily be included in the defendant's answer, but a

"delay in asserting an affirmative defense waives the defense only if the plaintiff was harmed as a

result."'" *Id.* (citing *Best v. City of Portland*, 554 F.3d 698, 700 (7th Cir. 2009) (quoting *Curtis v.

Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005))).

TGM argues that CSX waived its federal preemption affirmative defense by failing to

timely plead it when it responded to TGM's counterclaims on May 14, 2012.   CSX first asserted

the preemption defense via a motion for summary judgment filed over three (3) months after it

filed its answer and without any explanation for the delay.   CSX asserts that TGM was aware of

the relevant federal regulations even before CSX filed suit, as evidenced by communications

between representatives of the two parties, including e-mail and phone conversations.   CSX also

asserts that TGM, throughout discovery, has focused on CSX's compliance with its own Operating

Rules, and that information is relevant to the preemption claims.

The Court notes that after CSX filed its preemption motion, TGM was granted leave to

engage and disclose a second expert on the federal preemption topic.   TGM was also able to file a

thorough response to CSX's motion.   In light of the above, the Court **FINDS** that TGM was not

harmed as a result of the delay in CSX's assertion of the federal preemption affirmative defense,

19

that CSX has not implicitly waived this defense, and the Court will, therefore, consider CSX's

motion for summary judgment based on federal preemption.

"Article VI of the Constitution provides that the laws of the United States 'shall be the

supreme law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary

notwithstanding.'"   *Fifth Third Bank ex rel. Trust Officer v. CSX Corp.*, 415 F.3d 741, 745 (7th

Cir. 2005) (quoting U.S. CONST. art. VI, cl.2).   The doctrine of preemption is derived from the

Constitution, and "operates to prevent the enforcement of state laws that conflict with federal laws

or regulations," and is classified into three categories: express, implied, and actual conflict

between state and federal law.   *Id.* at 745-46.   "In all three types of preemption, 'the ultimate

touchstone' is congressional purpose."   *Id.* at 746 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470,

485 (1996)).

"The Federal Railroad Safety Act (FRSA), in an attempt to ensure nationwide standards of

safety, states that preemption precludes state law negligence claims when a federal regulation

'covers' the same subject matter."   *Baker v. BNSF Ry. Co.*, No. 3:09-CV-0787-B, 2010 WL

4063203, at *3 (N.D. Tex. October 13, 2010) (citing 49 U.S.C. § 20106(a)).   Further, a federal

regulation is said to "cover" the same subject matter "when it substantially subsume[s] the subject

matter of the relevant law."   *Id.* (internal quotation omitted).   "The party advocating preemption

. . . bears the burden of demonstrating that a regulation "covers" the same subject matter of a state

law claim."   *Id.*

The Federal Railroad Safety Act ("FRSA"), 49 U.S.C. §§ 20101 *et seq.*, contains an

express preemption provision.   Specifically, under 49 U.S.C. § 20106(a):

> A State may adopt or continue in force a law, regulation, or order related to railroad
> safety or security until the Secretary of Transportation (with respect to railroad
> safety matters), or the Secretary of Homeland Security (with respect to railroad
> security matters), prescribes a regulation or issues an order covering the subject
> matter of the State requirement.

The issue, therefore, is whether the FRSA contains regulations covering the same subject matter as Illinois negligence law pertaining to the inspection of switches and the preservation of particular evidence.   The party asserting preemption "must establish more than that [the regulations] 'touch upon' or 'relate to' the subject matter . . . pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law."   *CSX Transp. Inc. v. Easterwood*, 507 U.S. 658, 664 (1993); *see also, Burlington Northern and Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 795 (7th Cir. 1999).

> Section 20106 provides safe harbor provisions, however:
>
> Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party--(A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section; (B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or (C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).

49 U.S.C. § 20106(b)(1).   "Congress added . § 20106(b) in 2007 to clarify that federal preemption does not apply under certain circumstances."   *Baker*, 2010 WL 4063203, at *3.   The party resisting preemption bears the burden of "proving noncompliance under this 'savings clause.'"   *Id.*

Plaintiff asserts that two of defendant's counterclaims are preempted, namely TGM's claim for negligent inspection of a rail switch (Count I of TGM's Counterclaim) and TGM's claim for spoliation of evidence (Counts IV of TGM's Counterclaim).   CSX asserts that these claims are based on Illinois tort law, and that regulations promulgated by the Federal Railroad Administration ("FRA") specifically cover the inspection of switches and the preservation of specific types of evidence, thereby preempting TGM's state law claims.

21

TGM asserts that Count I of its Counterclaim includes not only a claim for negligent switch inspection, but also, allegations of negligence arising from the conduct of CSX's engineer and conductor, which CSX does not address in its preemption arguments.   In its motion for summary judgment, CSX only asserts that TGM's negligence claim regarding negligent inspection of a switch is preempted.   Accordingly, the Court will only consider whether TGM's negligence claim with respect to the inspection of switches is preempted, and summary judgment based on preemption is **DENIED** with respect to TGM's negligence claims based on the conduct of CSX's engineer and conductor in operating the locomotive.

### A.  Negligent Switch Inspection Claim

CSX asserts that the FRSA regulations cover switch inspection.   CSX cites Part 218 of the FRSA regulations, entitled "Railroad Operating Practices," and found at 49 C.F.R. § 218.1. Section 218.4 incorporates 49 U.S.C. § 20106, which CSX claims gives Part 18 preemptive effect over state negligence laws.   More specifically, CSX asserts that the purpose of Subpart F of Part 218, entitled "Handling Equipment, Switches and Fixed Derails," is to "prescribe minimum operating rule requirements for the handling of equipment, switches and fixed derails."   49 C.F.R. § 218.91.   Further, § 218.1.03 addresses the handling, inspection and operation of hand operated switches and requires railroads to adopt and comply with an operating rule which complies with the section's requirements.   49 C.F.R. § 218.103(a)(1).   CSX contends that § 218.103(b)(3), (b)(4), and (b)(5) "cover" TGM's negligent switch inspection claim, and that claim is therefore, clearly preempted.   Section 218.103(b) specifically provides, *inter alia*:

> Employees operating or verifying the position of a hand-operated switch shall: . . . (3) Be individually responsible for the position of the switch in use; (4) Visually determine that switches are properly lined for the intended route and that no equipment is fouling the switches; (5) Visually determine that the points fit properly and the target, if so equipped, corresponds with the switch's position . . . .

TGM focuses its arguments on the applicability of the savings clause to this claim, thereby by-passing the determination that the federal regulations "cover" the same subject matter as TGM's negligence claim.   In light of this, the Court finds that CSX has met its burden of proving that TGM's negligence claim is "covered" by 49 U.S.C. § 20106(a).   *See Baker*, 2010 WL 4063203, at *5.

     With regard to the applicability of the "safe harbor" provisions, CSX asserts that TGM has not alleged that CSX either violated the Federal standard of care, nor that CSX violated its own internal rules.   CSX further asserts that its "Operating Rules" contain detailed instructions regarding the handling and inspection of switches, and that it has therefore met its obligation to adopt operating rules that comply with the requirements of 49 C.F.R. § 20106(b)(1)(A).   Finally, CSX alleges that there is no evidence in the record that CSX's crew did not comply with its own Operating Rules.   CSX asserts that employees are required to ensure that all switches are aligned properly for the train's "intended route," and that the conductor followed these rules.   A number of CSX employees testified that the rules required inspection of only those switches that the CSX employee would be "handling," and not those that the employee was not handling.   Further, CSX asserts that TGM's expert who reviewed CSX's Operating Rules concluded that CSX's rules do not require the inspection of a switch over which the train is parked.   CSX's expert also concluded that neither the applicable federal regulations nor CSX's Operating Rules require such an inspection.   CSX argues, therefore, that there is no reliable evidence that CSX employees failed to follow the CSX Operating Rules that comply with the requirements of 49 C.F.R. § 218.103, and that the safe harbor provided by 49 U.S.C. § 20106(b)(1)(B) is not available to TGM.

     TGM argues that the Federal Regulations and CSX's own rules required the conductor to perform a detailed inspection of the train, its cars, and component parts, and an extensive brake

test, which would necessitate inspections of both sides of the train.   TGM claims, however, that the CSX conductor merely leaned over the top of a moving vehicle from a passenger window, traveling past only one side of the train, and therefore failed to perform the requisite inspection. TGM asserts that a properly conducted inspection would have revealed to CSX's conductor that a target was missing from the switch, which would have led to a further inspection of the switch, and revealed the deficiencies that caused the derailment.

TGM also asserts that particular provisions in CSX's Operating Rules suggest that the conductor was required to inspect the switch at issue.   TGM cites, among others, CSX Operating Rule 104 B, which provides that "rolling equipment must not foul a track until it can be visually determined the switches . . . connected with the movement are properly lined . . . ."   (Doc. 100-4). Rule 103 provides that "when shoving or pushing equipment at any location, a crew member or other qualified employee must take action to prevent damage," and make a "visual determination" that "intervening switches . . . are properly lined for the intended movement."   Finally, TGM asserts that Cletis Summers, a CSX employee for more than 40 years, testified that CSX's Operating Rules required CSX's conductor to inspect the switch at issue.   TGM also asserts that Jim Grupposso agreed that CSX's Operating Rules required the conductor to inspect the switch at issue.

TGM has presented evidence that creates a genuine issue of material fact as to whether CSX's Operating Rules did, in fact, require CSX's conductor to inspect the switch.   In other words, a genuine issue of material fact remains as to whether CSX failed to comply with its own rules, in which case, the safe harbor provisions would save TGM's claim from federal preemption. Summary judgment, is, therefore, not available, and CSX's motion for summary judgment on the negligent switch inspection claim of Count I of TGM's counterclaim is **DENIED**.

### B. Spoliation Claim

CSX asserts that the FRSA has promulgated regulations which specifically address the retention and preservation of data obtained from locomotive event recorders as well as "any other locomotive-mounted recording device or devices designed to record information concerning the functioning of a locomotive or train" that was involved in an accident or incident that was required to be reported to the FRA.   49 C.F.R. § 229.135(e).   CSX asserts that § 229.135(e) clearly covers the subject matter of TGM's spoliation claim, which relates to video from a video camera mounted on the lead locomotive, and therefore, the claim is preempted.   CSX further asserts that the safe harbor provision is not applicable, and therefore, TGM's spoliation claim in Counts IV of its counterclaim is preempted.

Section 229.135(e) provides:

> If any locomotive equipped with an event recorder, or any other locomotive-mounted recording device or devices designed to record information concerning the functioning of a locomotive or train, is involved in an accident /incident that is required to be reported to FRA under part 225 of this chapter, the railroad that was using the locomotive at the time of the accident shall, to the extent possible, and to the extent consistent with the safety of life and property, preserve the data recorded by each such device for analysis by FRA.   This preservation requirement permits the railroad to extract and analyze such data, provided the original downloaded data file, or an unanalyzed exact copy of it, shall be retained in secure custody and shall not be utilized for analysis or any other purpose except by direction of FRA or the National Transportation Safety Board.   This preservation requirement shall expire one (1) year after the date of the accident unless FRA or the Board notifies the railroad in writing that the data are desired for analysis.

CSX asserts that the safe harbor provision, 49 U.S.C. § 20106(a)(2) is not applicable to TGM's spoliation claim.   CSX contends that the federal standard of care required CSX to preserve electronically recorded evidence for one year unless certain federal agencies requested that it be kept longer, but no such request was received.   After July 3, 2010, CSX asserts, one year after the derailment and eight months before this litigation began, CSX's duty to preserve the

evidence expired.   CSX asserts that the safe harbor provision would apply if TGM could prove that CSX did not comply with its own rules that were adopted pursuant to § 229.135, but CSX asserts that there is no evidence that CSX failed to comply with its own policy.

TGM asserts that § 229.135 does not apply to the video recorder at issue, because the video recorder does not record locomotive and train *functions* as required by the statute.   TGM claims that the video footage would show that the locomotive was accelerated by the engineer to the point that the engines were hopping up and down and that the engineer caused the train to move forward a short distance after the train had come to a stop on its own, despite previously confirming with the conductor that the air brakes were not the cause of the stoppage.   TGM argues that        § 229.135(e) applies to devices that record information related to the functioning of locomotives, which would include train speed, throttle position, tractive effort, distance, etc., as required pursuant to § 229.135(b).

TGM further asserts that CSX's own retention policy to preserve derailment investigative materials and information until the end of the calendar year of the derailment plus two years, was violated by CSX, and makes the safe harbor provision applicable here.

The Court **FINDS** that because the video recorder does not record functions of the locomotive as listed in the federal regulation, it is not "covered" by the FRSA, and the spoliation claim with respect to the video recorder is not preempted.   Furthermore, even if the statute did cover the video recorder at issue, TGM has asserted facts that present a genuine issue of material fact as to how long CSX was required to retain the recording in accordance with its own operating procedures.   Accordingly, summary judgment is not appropriate, and CSX's motion for summary judgment as to Count IV of TGM's counterclaim, based on federal preemption, is **DENIED**.

V.     **TGM's Motion for Summary Judgment on Count II of CSX's Amended Complaint – Negligence**

TGM seeks summary judgment on Count II of CSX's Amended Complaint on the basis that CSX has failed to produce an essential element of negligence, namely, causation.   TGM asserts that there is no evidence on the record from which a trier of fact could reasonably infer that TGM personnel "ran through" the switch at issue, and to do so would be merely speculation or conjecture.   Accordingly, TGM argues that it is entitled to summary judgment because CSX has not produced sufficient evidence to create a genuine issue of material fact with respect to causation.

The elements of a negligence action include (1) duty, (2) breach, (3) causation, and (4) damages.   *Combs v. Schmidt*, 976 N.E. 2d 659, 664 (Ill.App.Ct. 2012).   "The breach of duty must be the proximate cause of the injury.   Proximate cause is 'a cause that, in the natural or ordinary course of events, produced the plaintiff's injury.'"   *Lani v. Advocate Health and Hospitals Corp.*, No. 2-11-0828, 2012 WL 6969867 at *3 (Ill.App.Ct. Nov. 30, 2012) (internal citation omitted) (quoting *Richter v. Village of Oak Brook*, 958 N.E.2d 700, 709 (Ill.App.Ct. 2011).

CSX contends that three experts have opined that the cause of the derailment was that the switch at issue had been run through prior to derailment, which could only have occurred because the switch was improperly aligned.   CSX asserts that one of TGM's experts has opined the switch was improperly aligned either because of TGM's negligence or that an act of vandalism occurred, but there is no evidence whatsoever that an act of vandalism occurred here.   CSX's expert, Barnum, upon review of the evidence concluded that it is "highly probable if not virtually certain" that TGM left the switch improperly aligned, ran through it while loading the railcars, and left the switch that way.   (Doc. 91-16 at 3).   CSX admits that it is "theoretically possible" that when CSX reversed the rail cars, the switch may have been run through at that time, but CSX maintains that

27

this event was not the first negligent act in the causal chain that led to the derailment.   CSX maintains that TGM left the switch in the wrong position, and it was TGM's negligent act of leaving the switch in the wrong position which caused the run-through and the damage to the switch, and ultimately the derailment.

Upon review of the evidence presented by both parties, a genuine issue of material fact remains with respect to causation, and TGM's motion for summary judgment as to Count II of CSX's Amended Complaint is, therefore, **DENIED**.

### VI.   TGM's Motion for Summary Judgment as to Count III of CSX's Amended Complaint – Res Ipsa Loquitur

TGM seeks summary judgment as to Count III of CSX's Amended Complaint on the basis that CSX's theory of res ipsa loquitur fails because TGM was not in exclusive control of the switch that caused the derailment.   TGM asserts that CSX has not presented sufficient evidence showing that TGM was in exclusive control of the switch, and, in fact, the evidence shows that TGM did not have any control of the switch between the close of business on July 2, 2009, and the derailment on July 3, 2009.   TGM asserts that CSX has also failed to produce evidence that the derailment at issue "ordinarily does not happen in the absence of negligence."   CSX's manager of Train Accident Prevention admitted that such derailments can occur as a result of operator error or negligence, or by vandalism.

CSX asserts that it has established that a "run through" switch "ordinarily does not happen in the absence of negligence," and that the switch was improperly aligned during the time that TGM was in "exclusive control" of the switch.   CSX has previously admitted, though, the possibility that the switch was "run through" when it reversed the railcars.

Whether the doctrine of *res ipsa loquitur* applies is a question of law.   *Imig v. Beck*, 503 N.E.2d 324, 329 (Ill. 1986).   The plaintiff bears the burden of proving all elements of the doctrine.

28

*Dyback v. Weber*, 500 N.E.2d 8, 12 (Ill. 1986).

> Under the doctrine, the facts of the occurrence show *prima facie* the defendant's negligence if the plaintiff establishes (1) that the occurrence is one that ordinarily does not occur in the absence of negligence and (2) that the defendant had exclusive control of the instrumentality that caused the injury.   When these elements are shown, the occurrence itself, under *res ipsa loquitur*, "affords reasonable evidence, *in the absence of an explanation by the party charged*, that it arose from want of proper care."

*Id.* (quoting *Metz v. Central Illinois Electric & Gas Co.*, 207 N.E.2d 305, 307 (Ill. 1965)).   CSX has admitted that it backed the railcars over the switch between the time that TGM left the railcars loaded on the track on July 2, 2009, and the time of the derailment on July 3, 2009.   The record, therefore, contains conclusive evidence that TGM did not have exclusive control of the instrumentality that caused the injury, and CSX cannot, therefore, meet the second element of the doctrine.   Accordingly, TGM's motion for summary judgment as to Count III of CSX's Amended Complaint is **GRANTED**.

## CONCLUSION

CSX's motion for summary judgment (Doc. 64) is **GRANTED IN PART** and **DENIED IN PART**, as follows: the motion is **DENIED** as to Count I of its amended complaint, and as to Counts I, III, and IV of TGM's Counterclaim.   CSX's motion for summary judgment is **GRANTED** as to Count V of TGM's Counterclaim.   CSX's motion for summary judgment based on federal preemption (Doc. 90) is **DENIED** on all grounds raised.   TGM's motion for summary judgment (Doc. 92) is **GRANTED IN PART** and **DENIED IN PART** as follows: the motion is **DENIED** as to Count I and II of CSX's Amended Complaint, and **GRANTED** as to Count III of CSX's Amended Complaint.

**IT IS SO ORDERED.**

**DATE: <u>March 29, 2013</u>**

**/s/   WILLIAM D. STIEHL**
**DISTRICT JUDGE**

29
